**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**BAHRAM OMIDIAN and RAMONA OMIDIAN,**
*on behalf of their child, K.O., a student with a*
*disability,*

                    **Plaintiffs,**

          **v.**                                    **6:05-CV-0398**
                                                     **(NAM/GHL)**

**BOARD OF EDUCATION OF THE NEW**
**HARTFORD CENTRAL SCHOOL DISTRICT,**


                    **Defendant.**
_____

**APPEARANCES:**                    **OF COUNSEL:**

Young, Sommer, Ward, Ritzenberg,      Kenneth S. Ritzenberg, Esq.
Baker & Moore, LLC
Executive Woods
5 Palisades Drive
Albany, NY 12205
*Attorney for Plaintiffs*

Ferrara, Fiorenza, Larrison,          Susan T. Johns, Esq.
Barrett & Reitz, P.C.
5010 Campuswood Drive
East Syracuse, NY 13057
*Attorney for Defendant*

**Norman A. Mordue, Chief U.S. District Judge:**

                    **MEMORANDUM DECISION AND ORDER**

**I.        INTRODUCTION**

        Bahram Omidian and Ramona Omidian ("plaintiffs") bring this action on behalf of their

child, K.O., a student with a disability.  In their first cause of action, plaintiffs allege that

defendant Board of Education of the New Hartford Central School District ("the District") violated K.O.'s substantive and procedural rights under the Individuals with Disabilities Education Act, ("IDEA"), 20 U.S.C. § 1401 *et seq*., and Article 89 of the New York State Education Law.  Plaintiffs seek reimbursement from the District for the tuition and costs associated with their unilateral placement of K.O. at The Family Foundation, a private residential school, during the 2002-2003, and 2003-2004 school years.  In their second cause of action, plaintiffs allege that the District violated K.O.'s rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by failing to evaluate K.O. and place him in the appropriate educational setting.  Presently before the Court are the parties' motions for summary judgment.

## II.    THE IDEA

The purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs[.]"  20 U.S.C. § 1400(d)(1) (A).  The IDEA "mandates federal grants to states to provide disabled children with a 'free appropriate public education' in the least restrictive appropriate environment."  *Polera v. Board of Educ*. *Newburgh Enlarged City Sch. Dist*., 288 F.3d 478, 481 (2d Cir. 2002) (citing 20 U.S.C. §§ 1400(d)(1)(A), 1401(8), 1411(a)(1) & 1412(a)(5)(A)).  A school district administers its services through the development of an "individualized education program" ("IEP") for each disabled child.  20 U.S.C. § 1414(d). In New York State, local committees on special education ("CSE") are responsible for developing appropriate IEPs.  *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998) (citing N.Y. Educ. Law § 4402(1)(b)(1) and *Heldman v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992)). Parents who believe that the state has failed to provide their child with a free appropriate public

education "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Gagliardo v. Arlington Cent. Sch. Dist*, 489 F.3d 105, 111 (citing *School Comm. of the Town of Burlington v. Department of Educ.*, 471 U.S. 359, 370 (1985)).

## III.   BACKGROUND

### A.   Administrative Record

K.O. was born on August 17, 1988.  K.O. attended Hughes Elementary School in the New Hartford Central School District from kindergarten until sixth grade, where, generally, he did well.  J. Ex. 8.  Upon entering seventh grade at Ralph Perry Junior High School in New Hartford in the fall of 2000, K.O. became disorganized, and started to fail courses.  T.1223-24.   During that school year, school administrators and teachers disciplined K.O. thirty-seven times for, *inter alia*, insubordination, failure to do work, being disrespectful, not telling the truth, and using inappropriate language.  K.O.'s mother stated that during that time, K.O. came home from school angry and became loud and verbally abusive.  T. 1228-30.

According to K.O.'s mother, in October 2000, the District held a meeting regarding K.O.'s academic performance which plaintiffs, the guidance counselor, the dean of students, several of K.O.'s teachers, and K.O. attended.  T. 1224.  At the meeting, K.O.'s father explained that K.O. had congenital adrenal hyperplasia[1] and that it "was probably interfering with his behavior" because his endocrinologist had recently directed K.O. to stop the medication he had

---

[1] At age seven, K.O. was diagnosed with congenital adrenal hyperplasia for which he received steroid treatment under the care of an endocrinologist.  As a result of this condition, at age 12, K.O.'s bone age was equivalent to that of a 17 year-old.  Additionally, K.O. had a large physical stature and was obese.  K.O.'s endocrinologist directed that K.O. discontinue the steroid treatment the summer before K.O. entered seventh grade.

been taking for that condition.  T. 1225.  The District did not offer any services at that time.  T. 1226.

In November or December of 2000, K.O.'s mother enrolled him in Sylvan Learning Center for academic assistance after school.  T. 1227.  K.O., however, became defiant, and it was difficult for plaintiffs to get him to attend.  T. 1229.

K.O.'s mother testified that in November 2000, she met with Christine Porter, a District social worker, who informed her that K.O.'s "behavior was becoming awful in school".  T. 1232-33.  According to K.O's mother, Porter suggested that K.O. be seen by a psychiatrist or placed on medication for his behavior.  T. 1232.  At a later meeting with Porter, K.O.'s parents asked whether the District offered psychological evaluations.  T. 1235.  According to K.O.'s mother, Porter responded that it did not, but that the District referred people to Youth Empowerment.  *Id.*

On March 15, 2001, Frantz Muse, M.D., MS, from the Youth Empowerment Project, conducted a psycho-social-medical assessment of K.O.  J. Ex. 2.  Dr. Muse diagnosed K.O. with oppositional defiant disorder ("ODD"), and recommended a treatment plan that included individual, parental, and family therapy.  *Id.*  Plaintiffs employed Youth Empowerment and followed through on the therapy recommendations.  T. 1257-58.

On March 19, 2001, the District's instructional support team met to formulate an instructional support plan for K.O.  P. Ex. 6, T. 798.  The plan recognized K.O.'s insubordinate behavior with staff, refusal to comply with academic requests, failure of academic courses and frequent involvement in disciplinary actions as areas of concern.  P. Ex. 6.  The plan directed that a number of "modifications or adaptions" be implemented to "further support" K.O.'s "school achievement", including the maintenance of a behavior log by K.O.'s teachers documenting his

4

behavior.  *Id.*  The plan also recommended that K.O. be referred for a psychological evaluation and to Persons In Need of Supervision Diversion ("PINS").  *Id.*  An after school plan, restricted hallway passes, and weekly contact with a school counselor were also recommended.  *Id.*

In a letter dated March 23, 2001, Porter referred K.O. to PINS and requested that K.O.'s case be accepted for review.  P. Ex. 2.  In an addendum to the referral, Porter stated that K.O.:

> has become increasing oppositional of authority both in school and at home.  His behavior in school manifests itself in more passive aggressive forms of insubordination.  He will not comply with academic requirements and, as a result, is failing all primary academic courses, despite his intellectual capability.  At home, he defies parents' attempts to set limits, leaving the home whenever he chooses, and becoming physically aggressive when parents try to keep him to any parameters.

P. Ex. 3.  The subsequent PINS evaluation recommendations included school-based counseling with a social worker, academic support, and psychiatric consultation.  P. Ex. 8.

In letters dated April 9 and 26, 2001, K.O.'s father requested that the CSE evaluate K.O. to determine whether he had an educational disability that would make him eligible for services. P. Ex. 4, J. Ex. 4.

On May 3 and 7, 2001, school psychologist Leo Smith conducted a psycho-educational evaluation.  J. Ex. 8.  K.O.'s scores on the Wechsler Intelligence Scale for Children, Third Edition indicated cognitive functioning in the average range.  *Id.*  K.O. displayed ability in the average range on the Wechsler Individual Achievement Test in reading, reading comprehension, mathematics, and writing, and low average range in listening comprehension.  *Id.*  According to Smith, projective testing indicated that K.O. had issues with body image and authority figures in the home.  *Id.*  Smith noted that K.O. had been diagnosed with ODD and that he had a high number of discipline incidents "that appeared to be based in emotional difficulties."  *Id.*

5

Consequently, Smith recommended, *inter alia*, that K.O. be classified as emotionally disturbed, placed in a program with structure, and undergo a functional behavioral assessment, counseling, family therapy, and psychotherapy.  *Id*.

In a letter to the District dated May 11, 2001, Toby Taylor, M.D., K.O.'s physician, wrote that K.O. was:

> being treated for anxiety with obsessive compulsive characteristics.  He is also under evaluation for Attention Deficit disorder.  I started him on Clonidine two weeks ago to help with behavior and attention.  I have started a new treatment with Zoloft for anxiety and obsessive compulsive disorder.
>
> This letter is intended to help explain his current difficulties with school and to help you in formulating a plan to help him comply with school regulations and attendance.  I believe his current medical and psychological problems have been a great contributor to his current school problems.

J. Ex. 11.

In a "Social/Developmental History" dated May 11, 2001, that Porter prepared for the CSE review process, J. Ex. 9, T. 820, Porter reported that K.O. had become aggressive toward family members and was unmanageable "when he is refused something he wants to do."  J. Ex. 9. Porter also reported that at school, K.O. was close to failing all classes, had been "insubordinate, has brought cigarettes to school, has come to school under the influence of marijuana, has been verbally defiant of authority, has lied on numerous occasions to school staff, has been truant, and has refused to do homework."  *Id*.

On May 14, 2001, the CSE held a meeting to discuss K.O.'s placement.  J. Ex. 12.  CSE members recommended a classification of "emotionally disturbed".  *Id*.  In view of K.O.'s need for a "highly structured environment" and in order to "assist with his management needs", the CSE further recommended K.O.'s placement in an "adjustment B[oard] O[f] C[ooperative]

E[ducation] S[ervices]" ("BOCES") class consisting of twelve students, one teacher, and one aide.  *Id*.  The CSE recommended thirty minutes of counseling each week and that K.O. take tests in a "location with minimal distractions".  *Id*.  The CSE developed an IEP incorporating the classification of emotionally disturbed and the above recommendations.  J. Ex. 13.

According to K.O.'s mother, the District planned to place K.O. in the BOCES James Street Academy program.  T.1275.  K.O., however, refused to go because he did not want to leave Ralph Perry Junior High School where all his friends were.  T. 1281.  K.O.'s mother testified that, at home, K.O. became increasingly violent and talked about suicide.  *Id*.  K.O. barricaded himself in his room, smoked in his room, threw silverware and knives in the kitchen when he was angry, and became physically aggressive toward family members.  T.1282-83.

On May 30, 2001, K.O. was admitted to Four Winds Hospital in Saratoga, New York, where he was hospitalized for nine days.  T.1284, J. Ex. 17, P. Ex. 13.  Hospital records indicate that K.O. was admitted because of sleep and appetite disturbance, mood irritability, threatening and aggressive behaviors, and destruction of property.  P. Ex. 13.  K.O. was prescribed Wellbutrin and discharged with the diagnoses of mood disorder and ODD.  *Id*.

In a letter dated June 7, 2001, plaintiffs, through their attorney, informed Lynda Race, the CSE chairperson, that they disagreed with the District's IEP and rejected the CSE's proposed placement of K.O. at the BOCES James Street Academy program.  J. Ex. 16.

On June 12 and 25, 2001, Douglas Lipp, Ph.D., conducted an independent psychological evaluation at plaintiffs' request.  J. Ex. 21.  Dr. Lipp diagnosed K.O. with mood disorder NOS with depressive, manic and intermittent psychotic features, attention deficit/hyperactivity disorder ("ADHD"), and ODD.  *Id*.  Dr. Lipp opined that K.O. was "functioning quite maladaptively

7

across all domains of his life - academically, within his family, society and indeed within himself." *Id*. Dr. Lipp recommended that K.O. be placed in a residential treatment facility with a "highly supportive and structured living and learning environment" where he could receive a "sophisticated, multi-disciplinary diagnostic work-up and an integrated treatment program" suitable for a "complicated emotionally-disturbed youngster with emotional, behavioral, attentional and physiological needs and issues." *Id*. Dr. Lipp further recommended that ant treatment facility to which K.O. is referred should provide individual psychotherapy, family therapy, parental counseling to plaintiffs, and psychiatric evaluation and monitoring. *Id*.

On June 26, 2001, the CSE convened to discuss K.O., determined that he should be in a "small class environment with structure", and recommended placement in Pinefield Day Treatment at the Mohawk Psychiatric Center in a special education classroom with eight students, one teacher, and one aide. J. Ex. 23, T. 86-87. Accordingly, the CSE issued a new IEP for the 2001-2002 school year incorporating this recommendation and providing for an extended (twelve month) school year. J. Ex. 24. Plaintiffs agreed to the IEP and K.O.'s placement at Pinefield. J. Ex. 25

K.O. began attending Pinefield in the summer of 2001. T.1312-13. Plaintiffs were responsible for driving K.O. to Pinefield daily, but encountered difficulty when K.O. would refuse to go to school. T.1316. At one point, a Pinefield case manager and teacher went to K.O.'s home to try to get K.O. to go to school. *Id*. Plaintiffs encountered difficulty at the end of the school day as well because K.O. would leave Pinefield before they arrived to walk into New Hartford. T. 1319.

8

K.O.'s mother testified that while he was at Pinefield, things became "very bad" at home. T. 1320.  K.O. would sneak out of the house at night and became violent.  *Id*.  K.O.'s mother began to research therapeutic residential schools.  T.1319.  In the latter part of the summer, plaintiffs received a letter from the Devereux Foundation in Brandywine, Pennsylvania, regarding a residential program for ODD.  T. 1323.

On July 20, 2001, K.O. was admitted to the Devereux Foundation.  T. 1328.  In a letter dated July 20, 2001, plaintiffs, through their attorney, informed the District that the Pinefield Day Treatment program was not appropriate and that they had placed K.O. at Devereux.  J. Ex. 28. Plaintiffs requested that the CSE reconvene and adopt K.O.'s placement at Devereux.  *Id*.

K.O., however, stayed at Devereux for less than two weeks because plaintiffs observed "no education going on".  T.1324.  On August 9, 2001, plaintiffs placed K.O. in the residential program at KidsPeace.  T. 1327, J. Ex. 32.  KidsPeace is approved by the State of New York for special education and "provides a variety of mental health, psychiatric treatment, ranging from community services through inpatient hospitalization" to individuals under 21 years of age.  T. 652, 587.

Upon admission, K.O. underwent a psychiatric evaluation by Nirmala Yarra Karnam, M.D.  J. Ex. 32.  Dr. Karnam diagnosed K.O. with Intermittent Explosive Disorder, ODD, and a Depressive Disorder.  *Id*.  Dr. Karnam recommended "[r]esidential treatment with individualized educational programming to prevent acute hospitalization because [K.O.] was unable to benefit from outpatient treatment, and was aggressive to people."  J. Ex. 32.  Dr. Karnam further recommended individual, group, recreational, and family therapy as well as consultation with a dietitian and physician regarding K.O.'s diet and weight.  *Id*.

9

On August 20, 2001, the CSE reconvened to review K.O.'s IEP for the 2001-2002 school year.  J. Ex. 33.  The CSE considered the KidsPeace recommendation that K.O. be placed in a residential program where he would receive comprehensive academic and social emotional treatment.  T.110.  The CSE revised K.O.'s IEP to include residential placement at KidsPeace for twelve months.  J. Ex. 34.

At KidsPeace, K.O. was supervised 24 hours per day and all of his time was structured.  T. 705, 707.  K.O. received individual therapy on a weekly basis, and more frequently when necessary, from Gordon Wells, a KidsPeace employee and "mental health professional" with bachelor and doctoral degrees in psychology.  T. 587-88, 603.  Wells also provided weekly family therapy to K.O. and plaintiffs.  T. 603-04.  K.O. received recreational therapy from a certified therapist at KidsPeace regarding social situations, working in groups, and using leisure, as well as training in anger management and coping.  T. 711, 612.

K.O. continued seventh grade at KidsPeace.  T. 592-93.  K.O. was in a classroom with twelve students, one teacher, and one aide.  T. 651.  Alicia Aston, supervisor of education at KidsPeace, testified that the class was "[s]elf-contained", meaning that the students did not switch classes and had the same teacher all day except for art, music, physical education, and computer classes.  T. 651-52.  According to Aston, K.O. made friends, and responded to the small class size ratio.  T. 666-67.

K.O. completed seventh grade in December 2001 and eighth grade in June 2002.  T. 652-53.  K.O.'s final report card for eighth grade at KidsPeace indicates that K.O. received an A or a B in every class.  J. Ex. 51.

In April or May 2002, plaintiffs began discussions with KidsPeace about K.O.'s discharge.[2]  T. 1336.  On May 15, 2002, Aston sent a facsimile to Lynda Race at the District with "suggested goals and objectives and updated test scores for upcoming IEP" for the 2002-2003 school year.  J. Ex. 46.  These included recommendations in English, writing, math, world cultures or global history or global studies, earth science, art, music, computer science, health, physical education, and in the area of behavior.  *Id.*  The behavioral goals suggested that K.O. "improve his short-term memory skills", "accept responsibilities in the classroom", "follow directives from teacher and school personnel", "respond appropriately to redirection from in academic and social situations", "will make appropriate comments to other students and school personnel", "will communicate with others in an acceptable manner in the classroom", and "respond appropriately when given constructive criticism."  *Id.*

Aston sent a second recommendation to the District on May 20, 2002, stating that K.O. "will benefit from the following accommodations": a small classroom size; low student-teacher ratio; extended time for assignments and for assessments; availability of a calculator; subject matter that is broken down into small or "chunked" segments to better facilitate learning; and a grammar, spelling, and punctuation checklist for all written work.  J. Ex. 47.  Aston testified that she felt that if the IEP incorporated the suggested goals and objectives set forth in the report she sent to Race, K.O. could have returned to the District and been successful.  T. 691-92.

Wells testified that the recommendation at the end of the 2001-2002 school year was that

---

[2] K.O.'s mother stated that, at that point, she started researching boarding schools that accepted children with attention deficit hyperactivity disorder.  T. 1338.  Through her research, she came across The Storm King School, T. 1339, a private boarding school in Cornwall-on-Hudson, New York.  T. 30.  K.O. and plaintiffs toured Storm King and K.O. had an interview there.  T. 1339, 1345.  K.O.'s mother testified that K.O. was "excited about" Storm King and liked the facility and teacher that interviewed him.  T. 1344.

K.O. could function at home with support services.  T. 630.  According to Wells, K.O. had

progressed in treatment and a less restrictive program would best meet his therapeutic needs.  T.

632.  Wells stated that K.O. did not need twenty-four hour supervision because he had

demonstrated "over a significant period of time he could maintain himself".  *Id*.  Wells testified

that K.O. had developed social skills to allow him to interact in all social settings.  T. 633.

On June 12, 2002, the CSE convened to discuss K.O.'s placement in ninth grade for the

2002-2003 school year.  J. Ex. 49.  Race testified that Aston and Wells had informed her that

K.O. would be discharged and recommended that K.O. be placed in a small structured classroom

and that he receive counseling services.  T. 118.  At the meeting, CSE members recommended

that K.O. return to Ralph Perry Junior High School and be placed in a classroom with twelve

students, one teacher, and one aide, and that he receive counseling twice per week, access to a

calculator and word processor with spell and grammar check, and extended time to complete

tests.  J. Ex. 49.  Additionally, the District accepted responsibility for K.O. to remain at

KidsPeace through the summer to prepare for him for the transition back to the District.  T. 1342.

The IEP for the 2002-2003 school year incorporated these recommendations and

identified K.O.'s need for: "extended time to complete his assignments"; "information to be

broken down into smaller segments"; "a structured classroom with mainstreaming opportunities";

"counseling to address strategies for anger management and problem solving"; the development

of a "more positive self-image due to weight issues"; and participation "in physical activity."  J.

Ex. 50.

The parties dispute whether J. Ex. 50 or P. Ex. 27 is the final IEP for the 2002-2003

school year.  P. Ex. 27 contains greater detail and additional goals for K.O. with regard to

improving his short-term memory skills, appropriate behavior in the school setting, and key concepts in Math 1.  P. Ex. 27.  Race testified that P. Ex. 27, which included the additional goals not contained in J. Ex. 50, was the final IEP for 2002-2003.   K.O.'s mother disputed Race's assertion during her testimony before the IHO, and stated that she never received P. Ex. 27.  The SRO relied on J. Ex. 50 as the 2002-2003 IEP.

In a letter dated August 22, 2002, plaintiffs, through their attorney, advised the District that they rejected the proposed IEP for the 2002-2003 school year, and that they were placing him at The Storm King, a private boarding school, in Cornwall-on-Hudson, New York.  J. Ex. 53.  K.O.'s mother testified that she believed he was not prepared to return to the District because he had not received homework training and she felt "emotionally it would be very traumatic for him".  T. 1348.

Brian Morgan, dean of students, testified that Storm King has approximately 100 students and 30 faculty members, offers a high school curriculum, and is "focused on helping young men and women succeed."  T. 1071, 1075, 1072.  Morgan testified that Storm King does not provide special education services and that it is "not equipped or structured for the needs associated with special education children."  T. 1076.  Morgan stated that although there was a psychologist on staff, he worked as an admissions director.  T. 1077.

According to his mother, K.O. did "okay" at Storm King during the first month.  T. 1351.  Over time, however, K.O.'s grades and behavior deteriorated.  T. 1355-56.  K.O.'s mother testified that K.O. stopped going to class, was not doing homework, got into arguments with other students, and started to gain weight.  T. 1351, 1352.  Additionally, K.O. did not take care of his room or himself.  T. 1357.

13

In January 2003, K.O. began treatment with Mellen Lovrin, a nurse practitioner in psychiatry and began meeting with psychologist Lesley Pearl, Ph.D, on a weekly basis.[3]  J. Ex. 58.  Lovrin met with K.O. five times.  *Id*.  Lovrin stated that K.O. "presented with a depressed mood and reported having difficulty with concentrating and impulsivity."  *Id*.

In a letter dated February 8, 2003, Morgan informed plaintiffs that K.O.'s readmission to Storm King for the 2003-2004 academic year was "in jeopardy" because of his "non-compliance to school/community rules".  *Id*.  Morgan testified that K.O. "had a smoking issue", involvement in a physical altercation with a student, had removed a knife from a faculty department and lied about it, and struggled to "exercise really proper judgment".  T. 1088.

In a letter dated March 17, 2003, Roger Richard, associate head of Storm King wrote to plaintiffs to inform them that K.O. had been placed on academic probation because his winter trimester grade point average fell below 2.0.  J. Ex. 58.  A Storm King report card dated January 29, 2003, indicated that K.O. had received four Ds and three Cs, and had a cumulative grade point average of 1.24.  J. Ex. 60.

In a letter dated April 3, 2003, Lovrin indicated that K.O.'s mood had improved, but there was no:

> change in impulsivity based on self-reports as well as reports from his home and school.  The plan is to assess for changes in mood, including symptoms of hypomania and mania; to add a mood stabilizer to help control K[.O.]'s behaviors; to continue to monitor his overall mental status; to continue to monitor efficacy and side effects of medication; to encourage family therapy; and to work as part of a team with a psychologist as well as the staff of the school.

J. Ex. 58.

_____

[3] Dr. Pearl was not associated with Storm King

In a letter dated April 4, 2003, Dr. Pearl stated that some of K.O.'s "recent behaviors lend themselves to a fresh psychiatric evaluation". *Id*. Dr. Pearl felt it would be helpful for K.O. "[t]o be given weekly behavioral goals for him to meet in order to keep him focused on task and less likely to be distracted." *Id*. Dr. Pearl stated that it "would be important to K[.O.] to have a 'mentor' on the school campus who can review with him on a weekly basis the results of his academic, social, and emotional functioning." *Id*. Finally, Dr. Pearl opined that K.O. "needs more specific structure in his environment . . . in order to help him to achieve success." *Id*.

K.O.'s mother testified that in April 2003, after a disciplinary hearing regarding K.O.'s use of a knife to cut a hole in a mattress to hide cigarettes, K.O. was required to leave Storm King. T. 1362. Morgan testified that he spoke with plaintiffs about K.O. "needing perhaps more structure in terms of supervision that we could not offer." T. 1099. After a discussion with Morgan and a psychologist, plaintiffs decided to place K.O. at the Family Foundation School, a private boarding school with a "therapeutic component" in Hancock, New York. T. 1362, 1364, 988.

On April 8, 2003, plaintiff enrolled in the Family Foundation.[4] According to its brochure, The Family Foundation "is a fully accredited college preparatory [school for] teens at risk." P. Ex. 39. The Family Foundation is registered with the New York State Board of Regents and is accredited by the Middle States Association of Schools and Colleges. *Id*. The Family Foundation describes itself as a long term program for students aged twelve to nineteen with a minimum stay of "three semesters (18 months) and an average successful stay of 2 year[s]." T. 992, P. Ex. 39.

---

[4] K.O.'s mother testified that K.O.'s few days at home were "terrible" because he "did not sleep the whole entire time he was home", he was "yelling and screaming", "very angry and then he was crying." T. 1363. K.O. could not "understand why they had kicked him out because they had said such nice things about him at the meeting." *Id*.

According to Renee Gotthardt, a certified social worker at the Family Foundation, the Family Foundation utilizes the twelve-step program used by Alcoholics Anonymous and that "no matter what the difficulty, we treat it with the twelve steps." T. 991. Gotthardt explained that this program involves "identifying a problem, admitting that there is a problem, becoming willing to change it, and then looking for the resources to help make that happen." *Id*.

The Family Foundation operates in eight family units with "a pseudo mother and father staff people" and approximately thirty students "who act as brothers and sisters, look out for one another, care for each other." *Id*. Each family has a boys' dorm and a girls' dorm. T. 994. The students are responsible for cooking, cleaning, and laundry. T. 995. Additionally, each student is assigned a senior sponsor, who is a staff member, and a junior sponsor, who is a student who has been there for more than a year, and who has worked through "some of the difficulties that newer kids normally have coming in." T. 992.

The school provides weekly peer counseling and special group counseling facilitated by staff members, none of whom are mental health professionals. T. 988. 1039. The Family Foundation also offers parent group counseling, seminars, and family days for the parents to spend time with their children. T. 991-92.

The Family Foundation employs two social workers, and has a consulting psychologist, who meets with each student initially and again, if follow up is required. T. 988-89. There is also a consulting psychiatrist available who works weekly with students who are on psychotropic medication or experiencing a crisis. T. 988. Staff is available twenty-four hours per day. T. 989.

The Family Foundation does not have special education classes, but employs a special education teacher who, if necessary, tests and conducts classes for students who "are having

difficulties." T. 993. For students who were in special education classes prior to enrolling in the Family Foundation, the staff makes modifications as needed. T. 1004.

Gotthardt testified that, at most, there are fifteen students per class and all teachers are "trained to fit the education and learning style of the child", which includes spending extra time with the child, utilizing tutors, sending them to different classes, and, if necessary, sending the student to a special education teacher. T. 1005. Gotthardt stated that consequences for not doing homework, include losing mail or phone privileges. T. 1009. Additionally, students confront one another in the classroom when they observe problems arise. T. 1009-10.

Mary Hanstine, a teacher at the Family Foundation testified that "there is really no class work or test differences . . . from public school". T. 867. Hanstine stated, however, that the Family Foundation has a "stronger work ethic" because there a passing grade is 75, and in public schools, 65 is considered a passing grade. *Id*. Gotthardt testified that every student is enrolled in New York State Regents courses. T. 993.

Dr. Charles Moss, a consulting psychologist for the Family Foundation, conducted an initial evaluation of K.O. P. Ex. 52, T. 1036. Dr. Moss noted K.O.'s history at KidsPeace and Storm King. P. Ex. 52. Dr. Moss noted that K.O. admitted to having anxiety and having had an anxiety attack. *Id*. Dr. Moss noted there was no social phobia, and that K.O. "cries when in front of family". *Id*. The final note on Dr. Moss's handwritten evaluation is "Major Brat". *Id*.

In letters dated June 1 and 12, 2003, Race advised plaintiffs that a CSE meeting regarding K.O. would be held on June 24, 2003. Race requested that plaintiffs send the name and address of the school K.O. was attending and sign and return a release of information form to enable the

17

CSE to obtain accurate information for the CSE's upcoming annual review of K's progress.  J. Ex. 55, 56.

Plaintiffs did not respond to Race's request and the CSE meeting was postponed until July 16, 2003.  T.155-57.  On July 15, 2003, plaintiffs provided the requested documents and advised the District that they had placed K.O. at the Family Foundation.  J. Ex. 58.  The documents included copies of the letters from Storm King administrators regarding K.O.'s disciplinary problems and placement on academic probation based on his poor grades.  *Id.*   According to his Family Foundation report cards, as of July 9, 2003, K.O. had, by Family Foundation standards, passing grades in Global I, "Liv Skills", and Physical Education.  *Id.*  K.O. had failing grades in English 9, Earth Science, Home Economics, Math A1, and Spanish I.  *Id.*

The CSE convened on July 16, 2003, and recommended that K.O. attend a special education class at New Hartford Senior High School with twelve students, one teacher, and one aide.  J. Ex. 63.  Through their attorney, plaintiffs advised the CSE at the meeting that they were rejecting the IEP and intended to seek tuition reimbursement for the Family Foundation.  J. Ex. 61.

In a letter July 25, 2003, "To Whom It May Concern", Susan Runge, a social worker at the Family Foundation wrote:

> The Family Foundation School is an accredited junior/senior high school operating on a twelve-month school year.  The school has found it both necessary and beneficial for students to attend classes and receive counseling through the entire year since they are at high risk for delinquent and chemical abuse behaviors.  The average length of stay is twenty four to thirty months, but some students require a longer stay.
>
> The Family Foundation School provides psychological, moral, and academic training to educate students and help them to mature into healthy individuals.  The school also provides a substance-free residential setting.  K[.O.] attends weekly group counseling

meetings using a cognitive-behavioral therapy approach, confrontational therapy, and periodic family therapy. He has continual opportunity to work on his problems, and with effort on his part, should attain emotional stability and academic achievement at a level commensurate with his potential.

At entry, K[.O.]'s clinical evaluation indicated serious behavior problems including disobeying rules, substance use, stealing, academic underachievement, verbal and physical aggression, lying, compulsive overeating, and poor impulse control. His history includes treatment for Mood Disorder-NOS and Oppositional Defiant Disorder.

K[.O.] has been enrolled at the school for three months and is slowly responding favorably to the discipline and structure of The Family Foundation School. He attends classes regularly and completes schoolwork consistently. He has begun to engage with the 12-Step program, which will allow him to be honest with himself and help improve interpersonal relationships. He is making efforts to be obedient, follow rules, and reestablish a familial relation with his parents. He is beginning to relate appropriately to authority and peers. However, K[.O.] continues to struggle with anger issues, academic achievement, and the desire to return to negative and destructive behaviors.

It is our recommendation that K[.O.] continue his residential education at The Family Foundation School until he graduates. His history indicates that his condition is serious enough to require continued, uninterrupted care with 24-hour monitoring. K[.O.]'s prognosis is good, provided he has the opportunity to continue working on himself in a highly structure[d] environment.

J. Ex. 64.

In a letter dated July 30, 2003, to the Family Foundation, Race requested information regarding K.O., including academic testing and a psychological evaluation. J. Ex. 65. In a letter dated August 8, 2003, Race informed plaintiffs that the information furnished by the Family Foundation was insufficient to enable the CSE to ascertain K.O.'s academic, social, and behavioral needs. J. Ex. 68. Race proposed that since the Family Foundation would not allow K.O. to return to the District for testing, plaintiffs should make him available for an evaluation or arrange for testing to be completed and a report prepared. J. Ex. 68. The District and plaintiffs

19

eventually agreed to permit Jason Hans, Psy.D., a psychologist from the Hancock Central School District, which was near the Family Foundation, to perform an evaluation.  J. Exs. 69, 70.

Dr. Hans evaluated K.O. for two days and issued a psychological report dated August 2, 2003.  On the Wechsler Intelligence Scale for Children - Third Edition, K.O.'s scores indicated an overall IQ that fell in the high average range.  J. Ex. 75.  On the Woodcock Johnson III - Test of Achievement, K.O. scored within the average range in reading and mathematics, but did not do well on the writing portion of the test because he did not follow the directions.  *Id.*  On the Conners-Wells' Self report Scale, K.O. scored in the "Markedly Atypical range on the Conduct Problems scale, Cognitive Problems/Inattention scale, Hyperactivity scale, and Conners' ADHD Index."  *Id.*  K.O.'s score on the Reynolds' Adolescent Depression Scale fell in the 99th percentile.  *Id.*  According to Dr. Hans, this score suggested that K.O.'s level of depression "is most likely resulting in impairment in his daily functioning."  *Id.*  Behavioral testing suggested that K.O. has trouble concentrating and difficulty controlling his anger and emotions.  *Id.*  Social-emotional testing suggested that K.O. displayed "significant sensation-seeking behaviors, social stress, anxiety, depression, low self-esteem, and a poor attitude towards school and his parents."  *Id.*

As a result of his evaluation, Dr. Hans concluded that: (1) K.O.'s achievement scores indicated that he does not meet the criteria for classification as a student with a learning disability; (2) the classification of emotionally disturbed would still be appropriate; (3) K.O.'s "various emotional and behavioral difficulties" made it "difficult to determine whether many of his behaviors are the result of ADHD or . . . symptoms of his mood disorder" and therefore recommended a psychiatric consultation or evaluation; (4) that a psychiatrist may wish to

investigate whether medication would be beneficial for K.O.; and (5) "[c]ounseling is warranted

to treat K[.O.]'s mood disorder and low self-esteem.  Behavioral issue should also be addressed".

*Id*.  Finally, Dr. Hans stated:

> It is obvious that K[.O.] needs a program with intensive structure and behavioral management systems with immediate consequences for negative behaviors.  It appears that the Family Foundation School is equipped to meet K[.O.]'s behavioral needs.  Therefore, it is recommended that K[.O.] continue at the Family Foundation School.  It is also recommended that consultations with the school's psychiatrist be initiated to address the medication issue and further explore K[.O.]'s emotional and behavioral difficulties.

*Id*.

Dr. Hans testified that he concluded the emotionally disturbed classification remained

appropriate for K.O. because he continued "to have significant mood issues, behavior problems"

and "did not seem to have gotten any better in terms of his behavior or emotional issues".  T.

1165.  Dr. Hans stated that he recommended psychiatric consultation because the testing did not

clarify whether K.O.'s symptoms were as a result of a mood disorder or attention deficit disorder.

T. 1166.  Dr. Hans also testified that in light of K.O.'s "significant behavioral and emotional

issues" a psychiatrist might be able to determine if medication would be helpful to him.  T. 1166-

67.  Dr. Hans stated that he believed counseling would be beneficial for K.O. to address any

mood disorder or self-esteem issues.  T. 1167.  Dr. Hans stated that he recommended that K.O.

receive counseling weekly to address his mood disorder and low self-esteem, and that "hopefully

it would be someone . . . who has a degree in some sort of counseling field . . . . even better would

be specific training with depression or anxiety."  T. 1193.  While unable to state whether the

twelve-step program would be effective because he was "not familiar with the approach", Dr.

Hans testified that he believed the Family Foundation "had the structure and behavior

21

management systems that would be beneficial for" K.O.  T. 1168.  Regarding his

recommendation that K.O. should stay at the Family Foundation, Dr. Hans explained:

> I think the Parents had asked me to specifically mention how I felt about the Family
> Foundation School.  So I guess I wasn't specifically saying this was the best . . .
> program but that he was in a good program that has the structure and systems in place
> . . . for him to be successful . . . .
>
> In terms of the mood disorder and them treating it, I would think that individual
> counseling would probably be better equipped for someone who has a true mood
> disorder, and I don't believe the family school really employs that model.

T. 1213-14.

The CSE met on August 25, 2003, J. Ex. 77, and issued a revised proposed IEP for the

2003-2004 school year.  The IEP proposed that K.O. attend a special education class with twelve

students, one teacher, and one aide for "360 minutes" "5x" per week at a program located within

the Westmoreland Central School District,[5] J. Ex. 80, receive counseling twice per week, have

access to a word processor with spell check and grammar check, take tests "in a location with

minimal distractions" and have "extended time" to take tests.  J. Ex. 78.  The proposed IEP also

identified K.O.'s need for:  "extended time to complete his assignments"; "information to be

broken down into smaller segments"; "appropriate strategies to deal with frustration and stress";

development of "appropriate social skills to enable him to deal with difficult social situations";

employment and application of "more appropriate strategies for developing appropriate positive

peer relationships"; "a structured classroom with gradual mainstreaming opportunities";

"counseling to address strategies for anger management and problem solving"; "a mentor to

monitor behavioral goals" weekly; "redirection during class . . . with immediate feedback and

---

[5] Race explained that the class at Westmoreland High School was self-contained, had a full time
social worker, a time out room, and more structure than the District was able to offer.  T. 173-
74.

consequences for his actions"; a "more positive self-image due to weight issues"; and participation "in physical activity." J. Ex. 78. Additionally, the IEP recommended monitoring homework completion and extended time for homework; testing accommodations; giving K.O. assignments one week in advance; parental training; and preferential seating. *Id*. The IEP further recommended that K.O. "be gradually mainstreamed into regular education classes with his age mate peers as he is able to tolerate the less structured setting." *Id*.

During the CSE meeting on August 25, 2003, plaintiffs objected to the IEP and advised the CSE that they planned to pursue tuition reimbursement for the Family Foundation. J. Ex. 77, T. 1382, 1383. In a letter to Race dated October 31, 2003, plaintiffs, through their attorney, requested an impartial hearing to address the District's alleged failure to provide a free appropriate public education for the 2002-2003 and 2003-2004 school years and sought an order directing the District to reimburse them for the tuition and costs associated with K.O.'s Family Foundation attendance. J. Ex. 83.

To challenge their child's IEP, a parent may seek an "impartial due process hearing" before an impartial hearing officer ("IHO"). 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1). The school district or the parent, may appeal the IHO's decision to a state review officer ("SRO"). N.Y. Educ. Law § 4404(2). Either party "aggrieved by the findings and decision" made by the SRO may bring a civil action in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

A hearing before IHO George Kandilakas began on December 16, 2003 and concluded on March 5, 2004, after seven days of testimony. Lynda Race, Mary Ellen Mahanna from Oneida County BOCES, Gordon Wells from KidsPeace, Alicia Aston from KidsPeace, Christine Porter, Mary Hanstine from the Family Foundation, William Musgrove from the Family Foundation,

Renee Gotthardt from the Family Foundation, Brian Morgan from Storm King, Dr. Hans, and K.O.'s mother testified.

Although most of the witnesses' testimony and evidence adduced at the hearing has been incorporated above, there was evidence at the hearing regarding K.O.'s academic and behavioral progress at the Family Foundation after the last CSE meeting up to the conclusion of the IHO hearing, *i.e.* August 2003 through March 2004. K.O.'s report card for Fall Semester 2003 indicated that he was failing Earth Science, Home Economics, and Math A1. P. Ex. 58. K.O.'s grades from January 27, 2004, indicated that he was passing every subject. P. Ex. 58.

There is a letter dated October 25, 2003, signed by Renee Gotthardt, that is identical to the July 25 2003, letter by Susan Runge, J. Ex. 64, except that it states in the fourth paragraph that K.O. " has been enrolled at the school for *nearly seven months* and is slowly responding favorably to the discipline and structure of The Family Foundation School." P. Ex. 44 (alteration added). There is a third letter dated February 14, 2004, signed by Renee Gotthard, that is identical in all respects to the first letter except for the date and the individual signing the letter. P. Ex. 54. Gotthardt testified that the July 25, 2003, letter was reopened on the computer and a copy was printed out in response to a subpoena for the IHO hearing. T. 1020. Gotthardt stated that computer changed the date to February 14, 2004, the date on which the letter was printed. *Id*. Gotthardt testified that as of March 3, 2004, though "it would probably be the same letter; less severe, but again the same issues." T. 1024-25.

Gotthard further testified that as of that date, March 3, 2004, K.O. was:

> making more progress; academically . . . . We took a look at the grades and we can see that his grades certainly are getting better, but he does have a tendency to slack off every once in a while.

24

> Sometimes he loses motivation for school.  Again, when he has a positive attitude, things seem to go K.'s way; when he gets sullen, sunken, feeling very much like he's drowning in self pity, as he says, his grades have a tendency to go down.  It fluctuates.
>
> The same way with the anger, which I think is really a flip side of his depression.  Doesn't handle anger well at all, he has a tendency to shut down and close off.

T. 1025.

Gotthardt testified that there are three different stages at the Family Foundation:  stage one is "when the students first enroll, . . . resistant to change, learning how to abide by the rules . . . trying to decide whether . . . they want to make a change."  T. 1041.  Stage two is "compliancy", when the students "comply with all the rules" start to make a change, improve their grades, reconnect with family, take life more seriously and make decisions about changing behaviors.  T. 1042.  Stage three is when the students are ready to leave; "[t]hey have made a change and the intention is not to go back to the old behaviors", they uphold the rules, look out for others, and excel academically, emotionally, and socially.  *Id.*  When Gotthardt testified on March 3, 2004, she stated that K.O. was beginning to move into stage two.  *Id.*

Gotthardt testified that neither she nor Runge, who is also a social worker at the Family Foundation, provided counseling to K.O.  T. 1008.  Additionally, although Dr. Ivan Fras, the Family Foundation's consulting psychiatrist initially monitored K.O. while he was on psychotropic medication, Dr. Fras had not seen K.O. since the medication was discontinued.  T. 1026.

Mary Hanstine testified that K.O. entered her "Global 2" class in January 2004.  T. 877.  Hanstine described K.O. as "a quiet boy in my room, he is respectful.  He is rather lazy

concerning his school work.  Academically he is being challenged to do better, but socially and behaviorally he's been pleasant to have." *Id*.  Hanstine explained that by "lazy" she meant that K.O. "needs to go back and correct his homework on a regular basis; he hands in homework that is not acceptable.  He also fails quizzes and tests on a regular basis." *Id*.

William Musgrove, an athletic director, physical education teacher, and student advisor at the Family Foundation, testified that he is in K.O.'s "family" and sees him at least five days a week for a minimum of thirty minutes per day.  T. 927, 957.  Musgrove testified that K.O. has some emotional issues and that there are sponsors, who are also students at the Family Foundation, assigned to help K.O.  T. 934-35.  Musgrove testified that K.O. had lost ninety-five pounds since entering the Family Foundation.  T. 948.  Musgrove stated that K.O. was still "somewhat lazy" mentally, but had become "considerably better" and was passing all his subjects.  *Id*.  Musgrove testified that there were no reports of any physical confrontations between K.O. and the staff or his peers.  T. 948-49.  Musgrove testified that K.O.'s defiance had improved "drastically" although he would occasionally "get sulky when corrected".  T. 949.  Musgrove stated that K.O.'s lying had improved, but that he still lied "occasionally".  T. 950.  According to Musgrove, K.O. cried "a whole lot" when he entered the Family Foundation but that "rarely, if ever, do I see him cry at all now." *Id*.  Musgrove testified that K.O. had also become much more open since his arrival at the Family Foundation.  *Id*.  Musgrove stated that K.O. has not had any individual counseling since arriving at the Family Foundation.  *Id*. Musgrove testified that K.O. has being working on family problems while at the Family Foundation by doing "an extensive amount of talking" about his parents "at the table" with Musgrove and "other boys".  T. 981-82.

In a decision dated August 7, 2004, the IHO denied plaintiffs' request for tuition reimbursement for plaintiffs' unilateral placement of K.O. at Storm King finding that the program was not appropriate.  IHO Decision, p. 11.  Because the IHO found that Storm King was inappropriate for K.O., he concluded that "a careful analysis of the appropriateness of the District's [2002-2003] IEP was unnecessary."  *Id.*  The IHO ultimately found that plaintiffs' placement of K.O. at the Family Foundation was appropriate but that the balance of the equities weighed against plaintiffs with regard to tuition reimbursement prior to July 16, 2003, the date they first notified the District that K.O. was enrolled in the Family Foundation.  IHO Decision, p. 16.

The IHO further found that the 2003-2004 IEP was not reasonably calculated to allow K.O. to receive educational benefits because it did not account for "the severity of K.O.'s behavioral and emotional needs as described in the evaluations presented" to the CSE.  IHO Decision, p.15.  Specifically, in view of the CSE's failure to pursue Dr. Hans's recommendation that K.O. undergo a psychiatric consultation, the absence of any goals to address K.O.'s obesity, or need areas of written expression and following directions, and K.O.'s need for a highly structured learning and living environment, the IEP was not reasonably calculated to provide K.O. with a free appropriate education for the 2003-2004 school year.  *Id.*

The IHO then found that K.O.'s placement at the Family Foundation was appropriate.  *Id.*  Although the IHO recognized that the Family Foundation's failure to "provide counseling to address K[.O.]'s mood disorder and low self esteem by trained staff" was "a limitation of the program"  IHO Decision, p. 16, K.O. was nevertheless "making changes and improving his grades", "dealing with his anger and was feeling more comfortable in the group counseling",

"working on family issues and learning coping skills to deal with his sulkiness and depression."
*Id*. The IHO therefore concluded that the Family Foundation was appropriate for K.O. *Id*. The
IHO reduced the tuition award to eighty percent finding that plaintiffs "did not always cooperate
with the CSE in every way". *Id*. The IHO directed that plaintiffs receive reimbursement for
tuition beginning July 16, 2003, the date they first notified the District that K.O. was at the
Family Foundation. *Id*.

The District appealed the award of tuition reimbursement and plaintiffs cross-appealed the
IHO's decision to limit reimbursement to eighty percent. In a decision dated December 3, 2004,
State Review Officer Paul Kelly found that the 2002-2003 IEP was inadequate and concurred
with the IHO's determination that the District failed to demonstrate that it offered an appropriate
IEP for the 2003-2004 school year. The SRO, however, determined that plaintiffs failed to prove
that K.O.'s placement at the Family Foundation for the 2003-2004 school year was appropriate
and annulled the IHO's order directing the District to reimburse them for K.O.'s tuition.

Regarding the 2002-2003 IEP, the SRO found that given K.O.'s "demonstrated success in
Kids Peace's structured environment" the CSE should have included the suggestions KidsPeace
offered. SRO Decision, p.11. The SRO further found that the IEP deficient to the extent it did
not include "specific academic goals and objectives in the writing and math areas highlighted by
the Kids Peace recommendations." *Id*. Additionally, the SRO indicated that the inclusion of the
"other goals and objectives recommended by Kids Peace", even if they were "part of the generic
curriculum for all ninth graders . . . would have provided defined expectations for teachers,
defined targets towards which the student might have aimed his efforts, and provided reasonably
defined areas of content to enable the parents to gauge the student's progress." *Id*. Finally, the

SRO found that the 2002-2003 IEP failed to include any goals and objectives for K.O.'s individual counseling.  *Id*.

Regarding the 2003-2004 IEP, the SRO concluded that the District failed "to provide an appropriate program . . . that met the student's behavioral and emotional needs".  SRO Decision, p. 10.  Specifically, the SRO found that the IEP "did not take into account the severity of the student's documented behavioral and emotional needs and the student's need for a highly supportive and structured learning and living environment".  SRO Decision, p. 10-11.  The SRO also noted that the IEP failed to include goals addressing K.O.'s documented needs in the areas of written expression and following directions, or K.O.'s "obesity, which affects his self-esteem and physical education."  SRO Decision, p. 11.

The SRO further explained that 2003-2004 IEP suffered from the same inadequacy as the 2002-2003 IEP on which it was based to the extent it failed to incorporate the suggestions offered by KidsPeace, where K.O. had "demonstrated success".  *Id*.  The SRO further found that the goals and objectives contained in the 2003-2004 IEP "lack substantive content" and failed to "adequately address how the student will be involved in and progress in the general curriculum as recommended, and how the IEP will meet the student's management needs"  *Id*.  For example, the SRO explained, an annual goal which specified that K.O. would "demonstrate appropriate classroom behavior" was vague because it did not "specifically identify the targeted appropriate behaviors, nor are his management needs within the general school setting addressed."  *Id*.  Thus, the SRO concluded that the District failed to provide a free appropriate public education for the 2003-2004 school year.  SRO Decision, p. 12.

The SRO, however, found that the K.O.'s placement at the Family Foundation was not

appropriate to address his behavioral and emotional needs.  SRO Decision, p. 13.  Specifically, although the SRO noted that there was testimony that K.O. had made "some progress academically" the SRO found that the Family Foundation did not provide the special education services K.O. required.  *Id*.  The SRO further explained that in light of diagnoses of "obesity, mood disorder NOS with depressive, manic and intermittent psychotic features, ADHD, combined type, ODD, characteristic of OCD, and impulsivity," prescriptions for medications to address K.O.'s "various disorders", and recommendations that K.O. receive counseling from an individual with a degree in "social work, counseling, or psychology", the Family Foundation was inappropriate because it did not provide K.O. with counseling by an individual qualified to meet his needs.  SRO Decision, p. 13-14.

The SRO explained that K.O. only received counseling through the family unit in which he lived at the Family Foundation and group sessions with other students.  SRO Decision, p. 14. Additionally, the SRO indicated that although the twelve-step program the Family Foundation utilized was appropriate to address K.O.'s need for substance abuse counseling, it did not "meet the student's need for professional therapy and counseling to address the emotional and behavioral needs that affect his educational progress."  *Id*.  The SRO found comments in the record by individuals associated with the Family Foundation, including K.O.'s teachers, not only showed K.O.'s ongoing emotional needs but also "reflects judgmental comments of questionable therapeutic value".  *Id*.  The SRO cited, for example, notes from K.O.'s initial evaluation at the Family Foundation by Dr. Moss, that K.O. was a "major brat."  *Id*.  Thus, the SRO concluded that plaintiffs  failed to prove the appropriateness of K.O.'s placement at the Family Foundation for 2003-2004 and annulled the IHO's decision to the extent it found otherwise and awarded tuition

to plaintiffs.  SRO Decision, pp. 14-15.  This action followed.

    **B.**    **Additional Evidence**

    In support of its cross-motion for summary judgment, the District submitted an affidavit by Lynda Race introducing a number of exhibits, including letters by K.O.'s father to Dr. Fras and Dr. Moss at the Family Foundation.  Race Aff, Exs. A and B.[6]  The letter by K.O.'s father to Dr. Fras is dated December 17, 2004, and states:

> I am requesting an updated Psychiatric evaluation for my son, K[.O.] who attends The Family Foundation School.  The last evaluation you did was in August 2003. K[.O.] has been at the Family School for 20 months now and has made wonderful progress [i]n his academics.  He just completed taking the PSAT and SAT, due to the guidance office recommending he take them. K[.O.] has lost over 100 lbs . . . . K[.O.] was able to participate in the golf program and is currently on the cheerleading squad for the School basketball team.  The Counseling office advised us that K[.O.] was making great strides in group counseling and 12 step meetings. The Family School Social Worker has been available to K[.O.] on a as needed basis for individual counseling.  In light of K[.O.]'s emotional difficulty in the past 2 months, I have asked the Family School to make arrangements for K[.O.] to receive weekly individual counseling by either Susan Runge MSW or Renee Gotthardt MSW.  I would also like to have you follow him on a regular basis, perhaps monthly for Cog[nitive] and Behavioral Psychotherapy to address his negative emotions.

Race Aff., Ex. A.  The letter by K.O.'s father to Dr. Moss is dated February 5, 2005, and  states:

> I am requesting that you re-evaluate my son . . . for your special group counseling sessions.  Dr. Fras recently re-evaluated him only to find him still to be very defiant. Since K[.O.] continues after 22 months at Family School, to have negative emotions, I feel I need to advocate for him to get regular group counseling with either yourself, Susan Runge, or Renee Gotthardt.  If he has been receiving such counseling from yourself or the Social Workers, I would appreciate something in writing explaining K[.O.]'s counseling sessions with you and how often.

Race Aff., Ex. B.

---

[6]Although there is no indication that Race has personal knowledge of either letter, K.O.'s father acknowledges them in his affidavit.

Also attached to Race's affidavit are April 22, 2003, and December 22, 2004, psychiatric evaluations of K.O., by Dr. Fras.[7]  Race Aff., Ex. C.  The first report is dated April 22, 2003, and contains diagnoses of cannabis abuse and ODD and states that K.O. is at the Family Foundation because he was "kicked out" of Storm King and that K.O. had been aggressive and defiant toward his parents.  Race Aff. Ex. C.  In the second report, dated December 22, 2004, Dr. Fras stated that he was following up with K.O. at plaintiffs' request, and that K.O. was oriented, alert, and cooperative, and that plaintiffs "want to pursue he [sic] psychiatric route".  Race Aff, Ex. C.

The District also offers excerpts of sworn testimony by Jeffrey Brain, a consulting psychologist for the Family Foundation, and K.O.'s mother before an IHO ("second hearing") considering plaintiffs' separate petition for reimbursement for the 2004-2005 and 2005-2006 school years.[8]  Race Aff, Exs D and E.  Finally, the District submitted letters dated June 11, 2004 and November 10, 2004, by Renee Gotthardt of the Family Foundation.  Race Aff., Ex. F.[9]

The letter dated June 11, 2004, recounts K.O.'s history and describes the Family Foundation and the services it provides.  Gotthardt states that K.O. is "beginning to make changes in his lifestyle", and is "associating with a positive peer group, and is beginning to display appropriate behavior."  Gotthardt states that she believes K.O. should remain at the Family

_____

[7]Race lacks personal knowledge of both evaluations but states that they were received in evidence at a second IHO hearing concerning plaintiffs request for tuition reimbursement for the 2004-2005 and 2005-2006 school years.

[8]The parties' dispute regarding the 2004-2005 and 2005-2006 school years is the subject of a separate action before the Court, *Omidian v. Board of Education of the New Hartford Central School District*, 6:06-cv1171 (NAM/GHL) ("*Omidian II*").

[9]Race does not purport to have personal knowledge of either letter, both of which are addressed "To Whom it May Concern" but states that they were received into evidence at the subsequent IHO hearing.  Race Aff., Ex. F.

Foundation, however, because "he still presents a series of emotional and functioning problems. He is socially immature, tells lies, and has difficulty in the classroom both in academic achievement and motivation."  Gotthard states that she believes K.O. would revert to "adverse behavior" in a normal school setting because he is "attracted to a deviant lifestyle, wishes to belong to a 'cool' crowd, and has not developed a sufficient internal sense of self to be able to resist the influence of a negative peer group."  As a result, Gotthardt states, K.O.'s grades would suffer.  Race Aff., Ex. F.  In a letter dated November 10, 2004, Gotthardt again recounts K.O.'s successes emotionally and academically, but states that he "still struggles with negative emotion . . . often falls into resentment and self-pity, feeling licensed to break rules to make him feel like he is in control."  Race Aff., Ex. F.

        In reply, plaintiffs offer affidavits by K.O.'s father and psychologist Brain, as well as documents and sworn testimony by K.O.'s mother and psychologist Frank Doberman, Ph.D., from the second hearing.  In his affidavit, K.O.'s father states that K.O. has progressed to become a "healthy, academically successful young man who will graduate from High school in June and has been accepted into a four year college."  Omidian Aff. ¶ 7.  K.O.'s father acknowledges the documents Race attached to her affidavit as letters he wrote, but asserts that she misrepresents them.  K.O.'s father further states that since September 2005, K.O. has had home visits monthly, and is in constant communication with his family. Omidian Aff. ¶ 12.

        In his affidavit, Brain states that he has been providing counseling to K.O. since January 2005, and that K.O. "has become more honest, open and vulnerable in counseling sessions" and has "made tremendous progress while at The Family Foundation."  Brain Aff. ¶ 3.  Brain states that although K.O.'s initial progress at the Family Foundation was slow, he "has clearly

33

progressed".  Brain Aff. ¶ 7.   Brain asserts that during the first few months at the Family

Foundation, K.O. "was resistant to the structure of the school and not willing to fully participate

in classes and in his counseling sessions."  Brain Aff. ¶ 7.  Brain states, the "therapeutic and

supportive milieu" provided by the Family Foundation, "resulted in significant changes in K.O.'s

emotional well being and has manifested in appropriate behavior and academic success."  Brain

Aff. ¶ 8.  Brain concludes that "K.O.'s subsequent progress is the best indicator that he was

benefitting from his initial programming at The Family Foundation."  Brain Aff. ¶ 9.

Additionally, plaintiffs submit portions of K.O.'s mother's testimony before the IHO

concerning plaintiffs' action for tuition reimbursement for K.O.'s attendance at the Family

Foundation for the 2004-2005 and 2005-2006 academic years.  K.O.'s mother testified that there

was an incident in June 2004 which caused K.O. to regress.  K.O.'s mother stated that the "family

leader" Robin Ducey told K.O. and a girl in the "family" that they had to stop their relationship,

and that one of them had to "be removed from that family to break up this attraction".  According

to K.O.'s mother, Ducey suggested that K.O. be removed "and he was not happy about it . . . .

[s]o he . . . left the room . . . walked down the hall and deliberately kicked out one of the windows

in the hallway."  K.O.'s mother testified that although K.O. went through a difficult time when

the girl left the school, once she was gone "he seemed to turn around."  K.O.'s mother stated that

his grades "increased dramatically", he became a leader in his family, and was involved in sports

and drama.

Plaintiffs also submitted the testimony of psychologist Frank Doberman, Ph.D, who

testified at the second hearing.  Dr. Doberman did not evaluate or observe K.O., but reviewed

reports regarding K.O.  Dr. Doberman testified that the twelve-step program is recognized

primarily to address addictive behavior, alcohol, substance abuse, gambling, and sexuality.  Dr. Doberman stated that the twelve step program is a recognized approach for adolescents and, in his professional opinion, could be "one element of a comprehensive program" to address mood disorders but that it was not "sufficient to address mood disorders solely."  The twelve step program could also be used to address oppositional defiant disorder but was not sufficient because further consultation with behavioral specialists, working with parents and staff would also be required.

Dr. Doberman testified that he would recommend a highly structured educational program for K.O., and one "in which there is a high level of social work or psychological counseling involved".  Dr. Doberman explained that because K.O. has complex needs "and mentally he is a very difficult child at times in his behavior . . . he needs a high level of expertise in terms of licensed or certified social workers or psychologists able to see him on a regular basis . . . one to two times a week".  Dr. Doberman testified that the level of expertise in terms of licensed or certified counselors was important because the level of sophistication K.O. showed, "his intellectual ability" and because he was "highly complex" he required an experienced counselor. Dr. Doberman believed that the Family Foundation was meeting some of his needs but was not helping reintegrate into his family or society in general.  Dr. Doberman stated that the Family Foundation could impact K.O.'s mood disorder but that he still required psychological or psychiatric services.

Dr. Doberman stated on cross-examination that he agreed that from the date of K.O.'s admission to Four Winds hospital forward, K.O. needed residential placement, he then stated it was "one of the options".  Dr. Doberman testified that his most significant concern about the

Family Foundation was whether K.O. was internalizing new behaviors that would carry through in other environments, and that talking to a therapist would be a start to changing internally driven behavior.

At the second hearing, Brain testified that K.O. began individual counseling in January 2005 based on "concern about the length of time that [K.O.] had been here at the school and not made any appreciable progress". At that time, Brain stated K.O. "had an ongoing presentation of being sullen, depressed, sulky, unmotivated, underachieving, stuck, very stagnant in his progress, his development".

Through his affidavit, attorney Ritzenberg introduces K.O.'s Spring 2004 report card, which indicates that he passed all subjects, and K.O.'s Fall 2004 report card which indicates that in August 2004, he was passing everything except Math A2.

## III.    DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the

36

nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R.

Civ. P. 56(e).  A trial court must resolve all ambiguities and draw all inferences in favor of that

party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865

F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d

Cir. 1985).

> **A.      First Cause of Action:  IDEA**

In their first claim for relief, plaintiffs allege the District violated the IDEA by failing to

provide K.O. with a free appropriate public education and seek reimbursement for K.O.'s tuition

and expenses at the Family Foundation.  As the Second Circuit has noted:

> a motion for summary judgment in an IDEA case often triggers more than an
> inquiry into possible disputed issues of fact. Rather, the motion serves as a
> "pragmatic procedural mechanism" for reviewing a state's compliance with the
> procedures set forth in IDEA and determining whether the challenged IEP is
> reasonably calculated to enable the child to receive educational benefits.

*Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)

(citing, *inter alia*, *Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F.Supp. 501, 508 & n. 6 (E.D.N.Y.

1996) (analogizing the role Rule 56 motions play in allowing courts to review administrative

determinations in IDEA cases to the role Rule 12(c) motions play in allowing administrative

review of Social Security determinations)).

The role of the reviewing court in assessing the application of the IDEA's provisions to

the facts of a particular case is a mixed question of law and fact.  *See J.D. v. Pawlet Sch. Dist.*,

224 F.3d 60, 64 (2d Cir. 2000).  The Court's role in making this assessment is "circumscribed"

under the IDEA and the Supreme Court's decision in *Board of Educ. of the Hendrick Hudson*

*Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982).  "The responsibility for determining whether a

challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers." *Walczak*, 142 F.3d at 129.  Although their "rulings are then subject to 'independent' judicial review", this "'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.'" *Id.* (quoting *Rowley*, 458 U.S. at 205, 206).  Accordingly, when the state hearing officer's review has been "thorough and careful", the court is "expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"[10]  *Id.* (quoting *Rowley*, at 206, 208) (internal quotation marks omitted).

The IDEA provides that the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

In this case, plaintiffs seek reimbursement for K.O.'s tuition and costs at the Family Foundation for the 2002-2003 and 2003-2004 school years.  To obtain retroactive reimbursement for the cost of private school, the parents must establish that: (1) the IEP the school district proposed was inappropriate; and (2) the private placement was appropriate to the child's needs. *See Burlington*, 471 U.S. at 370; *see also Gagliardo*, 489 F.3d at 112 ("The party who commences an impartial hearing . . .bears the burden of persuasion") (citing *Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005)).  Finally, even if the parents satisfy these two factors, the decision

---

[10]Where, as here, the final state determination by the SRO conflicts with the earlier decision by the IHO, the Second Circuit has instructed that "the earlier decision may be afforded diminished weight."  *Gagliardo*, 489 F.3d at 114, n.2 (citing *Karl v. Board of Educ.*, 736 F.2d 873, 877 (2d Cir. 1984)).

whether to award tuition reimbursement is within the Court's discretion.  20 U.S.C. §

1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the

parents for the cost of [private] enrollment.")  "It is well established that 'equitable considerations

are relevant in fashioning relief' under the IDEA."  *M.C. ex rel. Mrs. C. v. Voluntown Bd. of*

*Educ.*, 226 F.3d 60, 68 (2d Cir. 2000) (quoting *Burlington*, 471 U.S. at 374).

### 1.    Adequacy of the IEPs

#### a.    2002-2003 IEP

Plaintiffs seek reimbursement for K.O.'s Family Foundation tuition and costs beginning

April 9, 2003, the date he enrolled, thus they must first show that the 2002-2003 IEP was

inappropriate.[11]  To determine whether an IEP was appropriate, the Court "must assess (1)

whether the state complied with the procedural requirements of the IDEA, and (2) whether the

challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'"

*P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 118 (2d Cir. 2008) (quoting

*Rowley*, 458 U.S. at 206-07).

As an initial matter, the parties disagree as to whether the IEP the SRO discussed in his

decision, J. Ex. 50, was the final IEP for 2002-2003.  CSE Chairperson Lynda Race testified that

her records indicated that P. Ex. 27, which contains greater detail, was the final IEP.  K.O.'s

mother testified, however, that she never received P. Ex. 27.  This dispute is immaterial.  The

primary reason the SRO found the 2002-2003 IEP inadequate was because the CSE failed to

incorporate the specific goals and objectives suggested by KidsPeace in areas including English,

---

[11] K.O.'s parents do not seek reimbursement for K.O.'s Storm King tuition and costs.

writing lab, global history, earth science, art, music, health, and physical education.  Neither J.
Ex. 50 nor P. Ex. 27 contain these goals and objectives.

The District argues, as it did before the SRO, that the CSE was not required, as a matter of
law, to include the academic goals and objectives because they are part of the generic ninth grade
curriculum.  The SRO rejected this argument and explained that "their inclusion in the IEP would
have provided defined expectations for teachers, defined targets towards which the student might
have aimed his efforts, and provided reasonably defined areas of content to enable the parents to
gauge the student's progress."  Alicia Aston, from KidsPeace, testified that if the "District
thought that they could meet the needs that were recommended in the suggested goals and
objectives" then, she believed, K.O. could have returned to the District.  T. 691.  In view of the
evidence of K.O.'s success at KidsPeace and Aston's testimony, the SRO had a factual basis for
concluding that the CSE's failure to include the KidsPeace suggestions rendered the IEP
inadequate and therefore was not reasonably calculated to enable K.O. to receive educational
benefits.  According due weight to the SRO's specialized knowledge and experience regarding
educational policy, the Court concludes that plaintiffs have established by a preponderance of the
evidence that the 2002-2003 IEP was inadequate.  Because plaintiffs also seek reimbursement for
K.O.'s attendance at the Family Foundation during the 2003-2004 school year, the Court will
address the 2003-2004 IEP, which the SRO also found was inadequate, before reaching the issue
of the appropriateness of the Family Foundation.

**b.    2003-2004 IEP**

For K.O.'s tenth grade year, the District proposed that he attend a special education class
at the BOCES program in the Westmoreland Central School District.  The SRO found the 2003-

2004 IEP inadequate because: (1) it did not include goals to address K.O.'s needs in the areas of written expression and following direction, or address K.O.'s weight issues; (2) the goals and objectives lacked specificity and did not correspond and align with K.O.'s needs; and (3) it did not take into account the severity of K.O.'s behavioral and emotional needs and his "need for a highly supportive and structured learning and living environment."  The District challenges these findings.

### i.      Procedural Adequacy

An IEP must satisfy a range of detailed procedural requirements.  The Second Circuit has held that a court must assess whether the IEP states:

> "(1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved."

*M.S.*, 231 F.3d at 102-03 (quoting *Walczak*, 142 F.3d at 122).

The District is correct to the extent it asserts that the record does not support a finding that K.O. had a need in the area of written expression.  Dr. Hans stated that K.O.'s poor performance on the writing portion of one of the tests he administered was due to K.O.'s failure to follow directions.  However, the only reference in the IEP to this need is a general objective which states that K.O. "will follow directives from teacher and school staff 100 % of the time" without any instruction to as to how to achieve this objective.

41

Next, the District argues that obesity is a medical condition for which it is not responsible. In the IEP, however, the CSE specifically acknowledged that in the area of physical development, K.O. "needs to develop a more positive self-image due to weight issues . . . . [and] needs to participate in physical activity." Thus, the District's argument is without merit. Although the IEP contains goals and objectives related to K.O.'s need to develop a more positive self-image, *e.g.*, K.O. will "identify and articulate positive personal attributes" by identifying "ten positive personal attributes" and integrating "these positive traits into his daily activities", it contains no annual or instructional objectives regarding physical activity. The IDEA requires "a statement of measurable annual goals," including benchmarks or short-term objectives. 20 U.S.C. § 1414 (d)(1)(A)(I). Thus, the IEP fails to satisfy the IDEA to the extent it fails to include goals or objectives related to physical activity.

As stated, the SRO further found the IEP inadequate because the goals and objectives did not "adequately address" how K.O. would be involved and progress in the general curriculum or how K.O.'s management needs would me met. The District contends that the sole purpose of K.O.'s placement in the BOCES adjustment class at Westmoreland was to address K.O.'s management needs. The District asserts that the testimony by Ellen Mahanna, principal of special education programs with Oneida County BOCES shows that the proposed placement would have offered the structured academic setting as well as behavioral resources sufficient to accommodate K.O.'s emotional condition and enable K.O. to receive educational benefits from the program.[12]

---

[12]Mahanna oversees the three BOCES classes run at the Westmoreland High School. T. 491. Mahanna testified that the "12:1:1 adjustment class" at Westmoreland is a program for students with emotional problems who need the "structured supportive environment of a special education classroom". T. 492-93. According to Mahanna, there is one social worker available for the three classrooms, and a "teacher assistant student manager" to supervise an "alternative learning room". T. 495-96. Mahanna stated the purpose of the alternative learning room is to

The IEP must recite "the specific educational services to be provided to the child , and the extent to which the child will be able to participate in regular educational programs". *M.S.*, 231 F.3d at 102-03.  Here, the IEP only states that K.O. will be placed in a "12:1:1 classroom-Westmoreland Senior High" and that he will "be gradually mainstreamed into regular education classes with his age mate peers as he is able to tolerate the less structured setting."  Moreover, there is no evidence that any information was provided to plaintiffs to apprise them of the nature of the Westmoreland program during the formation of the IEP at the CSE meetings.  Accordingly, the Court defers to the SRO's conclusion that the IEP was inadequate to the extent it failed to include a specific discussion regarding K.O.'s "progression in the general curriculum or management needs" and therefore failed to inform K.O.'s teachers and parents of the CSE's expectations for him.

The SRO found the goal that K.O.'s "behavior will be appropriate in the classroom" was vague because it did "not specifically identify the targeted appropriate behaviors."  The objectives that correspond to this goal state that K.O.: "will respond appropriately to redirection in academic and social situations 90% of the time; "will accept responsibilities in the classroom 100% of the time"; and "will follow directives from teacher and school staff 100% of the time".  There was evidence in the record regarding areas where K.O.'s classroom behavior at the Family Foundation had improved, and areas where he continued to struggle.  For example, one Family Foundation

provide another location for students who are having a "difficult time" to go, where they can talk to someone and "pull themselves together", before going back to class.  T. 496.  Mahanna testified that the adjustment class has a "specific management program" based on "individual needs" with a "positive reward system" based on the student's goals.  T. 506-07.  Mahanna testified that the social worker is accessible at all times.  T. 509.  The adjustment class follows New York State curriculum.  T. 510.  Mahanna stated that student misbehavior is addressed with the teacher, social worker, and assistant principal, and a consequence is imposed depending on the severity of the infraction.  T. 515.

teacher commented that K.O.'s classroom behavior was "okay", and noted that K.O. was "respectful and listens when direct statements are made" and that there had been some improvement in his class participation. J. 59. However, according to his science teacher, K.O. "has a tendency to try to manipulate teachers", "wants to talk and play all the time, he does not care if other students get in trouble for his behavior", "talks and fools around way too much in class". J. 59. K.O.'s math teacher noted that K.O. "likes to be a clown [and] get attention", and "is fairly manipulative and uses self pity to get what he wants". J. 59. In light of this evidence, the Court defers to the SRO's conclusion that the IEP should have included specific objectives denoting the areas where K.O. struggled in order to enable K.O.'s teachers to help him improve his classroom behavior. "[W]hether a procedural or a substantive issue-the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003).

### ii.       Substantive Adequacy - Residential Placement

The District argues that the IHO and SRO erred in finding that the IEP was inadequate for failing to account for K.O.'s need for a structures living and learning environment. The District asserts that Westmoreland BOCES program proposed in the IEP offered sufficient structure for K.O., and that he no longer needed residential placement in order to make academic progress after being discharged from KidsPeace.

"An appropriate education is one that is 'likely to produce progress, not regression.'" *Walczak*, 142 F.3d at 130 (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997) (internal citation omitted). A state need not "'maximize the potential of

44

handicapped children,'" but open the door of public education in a "'meaningful' way," and the

IEP must provide the opportunity for more than "'trivial advancement.'" *Id.* (quoting *Rowley*,

458 U.S. at 189, 192 and *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997)).

To conduct an "independent" review of the IEP at issue without "impermissibly meddling in state

educational methodology," *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d at 1121 (citing *Rowley*, 458

U.S. at 203, 207), the Court "must examine the record for any 'objective evidence' indicating

whether the child is likely to make progress or regress under the proposed plan". *Walczak*, 142

F.3d at 130.  "Because administrative agencies have special expertise in making judgments

concerning student progress, deference is particularly important when assessing an IEP's

substantive adequacy." *Cerra v. pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005).

When residential placement is necessary "due to a child's emotional problems, and the

child's emotional problems prevent the child from making meaningful educational progress," the

school district is required "to pay for the costs of the placement." *Mrs. B. v. Milford Bd. of Educ.*,

103 F.3d at 1122.  To determine "whether the child is likely to make progress or regress" under a

proposed day program, the court must "examine the record for . . . 'objective evidence'", such as,

"passing grades and regular advancement from grade to grade". *Walczak*, 142 F.3d at 130

(quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d at 1121).  Objective evidence of whether a

child "could make meaningful academic and social progress in a day program" is also relevant.

the Second Circuit requires "objective evidence of a child's regression in a day program before

finding a residential placement to be required by the IDEA." *Id.* at 132.

In this case, K.O. had not been in a day program since he attended Pinefield in 2001,

where he made no progress.  The District asserts that there is no evidence in the record showing

45

that K.O. needed residential placement at any time after being discharged from KidsPeace.  The

SRO found, however, that while at Storm King, K.O. regressed to the point where he required

residential placement.  The record supports this finding.

When K.O. was discharged from KidsPeace in August 2002, the staff recommended that

he attend a structured day program.  Instead, plaintiffs enrolled K.O. in Storm King, which

offered no special education or counseling, and had an unstructured living environment.  There,

K.O. was eventually placed on academic probation, and began to have behavioral problems.

Dean Morgan informed plaintiffs of K.O.'s behavioral problems in his letter dated February 8,

2003, advising that K.O. was not complying with "school/community rules."  Indeed, K.O. had

removed a knife from a faculty department, cut a hole in his mattress in which to hide cigarettes,

was involved in physical altercations with other students, was not attending classes, started to

gain weight, and was not taking care of his room or his personal hygiene.  Thus, there is evidence

to support the SRO's finding that K.O. regressed emotionally and behaviorally while at Storm

King.

The IHO and SRO further found that K.O. had regressed so far as to require a structured

living environment, *i.e.*, residential placement.  Dr. Pearl, a psychologist who had been providing

therapy to K.O. beginning in January 2003, wrote in a letter to plaintiffs dated April 3, 2003, that

K.O. was "struggl[ing] on a regular basis with trying to improve both his overall behaviors and

his academic work at the same time."  Dr. Pearl also felt that K.O. "need[ed] more specific

structure in his environment . . . in order to help him achieve success."

Dr. Hans opined that K.O. required "a program with intensive structure and behavioral

management systems for negative behaviors" and that the Family Foundation, which was

46

residential was "equipped to meet K[.O.]'s behavioral needs."  According to Dr. Hans, testing showed that K.O. had "a tendency to be bored easily, engage in risky/delinquent behavior, and a pervasive discomfort toward school."  Further, Dr. Hans noted in his report that testing indicated "a disturbed relationship with his parents along with a pervasive sense of dissatisfaction with himself." According to Dr. Hans, K.O. had low self esteem, and a poor attitude towards school and his parents."  Dr. Hans concluded that K.O "needs a program with intensive structure and behavioral management systems with immediate consequences for negative behaviors."  Thus, the SRO had a sufficient basis on which to conclude that K.O.'s emotional disability reached well outside the school setting and that structure in the living and learning environment was required to ensure academic progress.

In this case, the SRO copiously reviewed K.O.'s academic history, including his resistance to attending classes at the Pinefield Day Treatment Program while living at home, despite his parents' best efforts, his progress in the residential program at KidsPeace, where he benefitted from the small structured environment, received individual and group counseling from a trained psychologist, and earned passing grades in all core subjects, and his academic and behavioral regression at Storm King.  As the SRO noted, although residential, Storm King did not provide the structure or psychological support K.O. required.  Indeed, even Storm King's dean recommended that K.O. be placed in a school with more structured supervision.  Thus, the Court finds no basis on which to disturb the SRO's conclusion that in order to progress academically, K.O. required a structured living and learning environment.   According "due weight" to the

SRO's determination, the Court concludes that a preponderance of the evidence supports the

SRO's conclusion that K.O. required residential placement.[13]

## 2.       Unilateral Placement

Plaintiffs argue that the SRO erred in finding that their unilateral placement of K.O. at the

Family Foundation was inappropriate.  In *Frank G. v. Board of Educ. of Hyde Park*, the Second

Circuit explained:

> No one factor is necessarily dispositive in determining whether parents' unilateral
> placement is reasonably calculated to enable the child to receive educational benefits.
> Grades, test scores, and regular advancement may constitute evidence that a child is
> receiving educational benefit, but courts assessing the propriety of a unilateral
> placement consider the totality of the circumstances in determining whether that
> placement reasonably serves a child's individual needs. To qualify for reimbursement
> under the IDEA, parents need not show that a private placement furnishes every
> special service necessary to maximize their child's potential. They need only
> demonstrate that the placement provides educational instruction specially designed
> to meet the unique needs of a handicapped child, supported by such services as are
> necessary to permit the child to benefit from instruction.

459 F.3d 356, 364-65 (2d Cir. 2006) (citations and internal quotation marks omitted).

In this case, the SRO found that the Family Foundation was not reasonably calculated to

enable K.O. to receive educational benefits because it did not provide K.O. with access to

personnel with the qualifications necessary to address his behavioral and emotional needs, and

provided no individual counseling whatsoever.  Although K.O. was achieving passing grades, he

required residential placement because his emotional disability often interfered with his academic

progress.  It is undisputed that K.O. had no learning disability and testing indicated that he was of

above-average intelligence.  The SRO found that K.O. had "a significant history of emotional

problems", the Family Foundation did not offer the services necessary to address K.O.'s

---

[13]The additional evidence that the District submitted does not alter this conclusion since it
primarily concerns whether the Family Foundation is the appropriate placement for K.O.

condition, and, citing evidence that K.O. continued to struggle with emotional issues, therefore concluded that the placement was inappropriate.

As an initial matter, plaintiffs argue that the SRO erred as a matter of law when he concluded that the Family Foundation was inappropriate because it did not have certified special education teachers.  Indeed, a parent may obtain reimbursement for a unilateral placement in a private school even if the school is not on a state's approved list or has faculty members who are not state-certified.  *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 14 (1993).  In this case, however, the SRO did not find the Family Foundation inappropriate because it lacked special education teachers,[14] but rather, because it did not provide K.O. with counseling, individual or otherwise, by a trained professional and the supportive services it offered were insufficient as demonstrated by the absence of emotional progress.

The record contains ample evidence supporting the basis for undisputed classification of K.O. as emotionally disturbed, as well as evidence that this disturbance interfered with his academic progress.  Additionally, there is evidence that K.O. required counseling by professionals to treat his condition, and that the Family Foundation did not provide this treatment, or any individual counseling.  Mental health professionals had recommended psychotherapy and counseling for K.O. since as early as 2001.  At KidsPeace, K.O. received therapy weekly, and more often if needed, from psychologist Gordon Wells.  Plaintiffs obtained treatment from a psychiatrist and psychologist for K.O. while he attended Storm King.  Further, Dr. Hans

---

[14]Read in context, the SRO's decision indicates that he concluded that the Family Foundation did "not provide the special education services needed by this student" was not a finding that the Family Foundation was inappropriate because it was not state-certified to provide special education, but because it did not provide the special education services K.O. required to progress academically, specifically, professional services to address K.O.'s emotional and behavioral needs.

specifically recommended that K.O. receive counseling to treat his mood disorder, low self-esteem, and behavioral issues.  Dr. Hans testified that when he made this recommendation, he "hoped" that K.O. would receive counseling by someone with a degree in the counseling field, and more specifically, training in depression or anxiety.  Thus, the SRO had an adequate basis on which to conclude that K.O. required counseling by an individual with professional qualifications or training.

There is no evidence that K.O. received any counseling or therapy at the Family Foundation from an individual with professional qualifications.  Gotthardt, a social worker there, testified that she had not provided any counseling to K.O.  Further, although a psychologist and psychiatrist were available, neither provided therapy to K.O.  Indeed, there is no evidence K.O. received any individual therapy.  The only therapy K.O. received at the Family Foundation was group therapy through his peers, facilitated by faculty members, none of whom had mental health training.  For example, William Musgrove, an athletic director at the Family Foundation with no mental health training, testified that K.O. had been working on family issues by talking with him and other male students at the school.

Further, although the Family Foundation utilized the twelve-step program to treat any "difficulty" a student at the Family Foundation might have, and there was evidence that this program met K.O.'s need for substance abuse counseling, there is no evidence that it satisfied K.O.'s need for professional counseling to "address the emotional and behavioral needs that affect his educational progress."  Dr. Doberman testified that, in his opinion, the twelve step program could be one element of a program to address mood disorders, but, alone, was insufficient without the involvement of behavioral specialists.

50

Plaintiffs argue that K.O.'s academic, physical, emotional, and social progress at the Family Foundation demonstrates the appropriateness of his placement.  Although "a child's progress is relevant to the court's review . . . . such progress does not itself demonstrate that a private placement was appropriate."  *Gagliardo*, 489 F.3d at 115.  As stated *supra*, the Court must consider "the totality of the circumstances", including whether the placement provides educational instruction "'supported by such services as are necessary to permit the child to benefit from instruction.'"  *Frank G*., 459 F.3d at 365 (quoting *Rowley*, 458 U.S. at 188-89).

The record in this case, as the SRO briefly noted, shows that K.O. was making academic progress at the Family Foundation.  Indeed, K.O. was achieving passing grades in most, if not all, classes.  There is also evidence that K.O. had lost a significant amount of weight since the time he enrolled, thus improving his physical condition, and that he had made friends at the Family Foundation.  However, the record does not support a finding that K.O.'s emotional condition had improved.

In support of his finding that K.O.'s emotional condition had not improved, the SRO relied on a letter dated February 14, 2004 by Gotthardt which stated that K.O. continued "to struggle with anger issues, academic achievement, and the desire to return to negative and destructive behaviors".  P. Ex. 54.  As plaintiffs correctly point out, the date on this letter was computer generated and reflected the date on which it was printed off the computer, not the date it was originally issued, July 24, 2003.  Gotthard, however, testified that she would have sent out the "same letter" as of March 3, 2004, the date of her testimony, though "less severe", the letter would still reflect "the same issues."  T. 1024-25.

Additionally, Dr. Hans stated that he concluded that the label of emotionally disturbed applied because K.O. "still continued to have significant mood issues, behavior problems" and "did not seem to have gotten any better in terms of his behavior or emotional issues."  T. 1165-66. The SRO considered this not only as evidence of K.O.'s ongoing emotional disturbance, but also as evidence that the services the Family Foundation was providing were not meeting K.O.'s emotional needs.  Further, Gotthardt testified in March 2004, that although K.O. had made some progress (and was moving into "stage two"), his emotional progress had been slow and he still had "a lot of the same issues" and was "struggling with anger issues . . . and a desire to return to destructive behaviors."  T. 1042, 1024-25.

Notations in K.O.'s record, which the SRO found "judgmental" and of "questionable therapeutic value" further supported his conclusion that the therapeutic services offered at the Family Foundation were not appropriate to address K.O.'s emotional disturbance.  For example, Dr. Moss, who met with K.O. upon enrollment, noted that K.O. was a "major brat".

Plaintiffs further argue that the SRO overlooked Dr. Hans's recommendation of the Family Foundation.  Although Dr. Hans recommended that K.O. remain at the Family Foundation, his recommendation was not unequivocal.  Dr. Hans testified that he was not familiar with the twelve step process and therefore could not say whether it would help K.O. address his emotional problems.  Dr. Hans also testified that he believed K.O. should receive counseling from a professional, qualified to address his behavioral and emotional needs.

The additional evidence the parties submitted supports a finding that K.O. was not making emotional progress at the Family Foundation.  For example, although the letters by K.O.'s father dated December 2004, and February 2005 to Drs. Fras and Moss at the Family Foundation

indicate some emotional progress, they also contain requests for further psychological and psychiatric evaluations because of emotional difficulty, continued defiance, and negative emotions.  A letter by social worker Gotthardt dated June 2004 indicated that K.O. still had emotional problems, and is "socially immature, tells lies, and has difficulty in the classroom both in academic achievement and motivation."  Gotthardt further stated that she believed K.O. would revert to "adverse behavior" in a normal school setting because he is "attracted to a deviant lifestyle, wishes to belong to a 'cool', crowd, and has not developed a sufficient internal sense of self to be able to resist the influence of a negative peer group."  In her November 2004 letter, Gotthardt stated that K.O. "still struggles with negative emotion . . . often falls into resentment and self-pity".

Even the additional evidence on which plaintiffs rely supports a conclusion that K.O.'s emotional needs were not being met at the Family Foundation.  Brain testified that K.O. began counseling in January 2005 because of "concern about the length of time [K.O.] had been at the school and not made any appreciable progress".  Indeed, Dr. Doberman stated that the Family Foundation  was not an appropriate placement because K.O. needed a program "in which there is a high level of social worker or psychological counseling involved."

Viewing the totality of the circumstances, plaintiffs have failed to establish, by a preponderance of the evidence that the Family Foundation served K.O.'s emotional and academic needs.  The record shows that K.O. is not learning disabled and likely is of above-average intelligence.  However, the record substantially reflects that K.O. suffers from emotional issues that overwhelmingly contribute to his academic difficulties.  Having considered the evidence in the administrative record, the SRO's determination, as well as the additional evidence presented

by the parties, the Court finds that the preponderance of the evidence, including K.O.'s ongoing emotional needs, shows that treatment of K.O.'s emotional issues through individual and group counseling by trained mental health professionals together with a structured environment are services necessary to permit K.O. to benefit from instruction.   Accordingly, plaintiffs' motion for summary judgment on the first cause of action is denied.  Defendant's motion for summary judgment on the first cause of action is granted.

**B.      Second Cause of Action:  Rehabilitation Act**

In their second cause of action, plaintiffs claim the District failed to evaluate and place K.O. in an appropriate educational setting in violation of Section 504 of the Rehabilitation Act. The parties cross-move for summary judgment on this issue.

Section 504, in pertinent part, provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  To prove a violation of the Rehabilitation Act, plaintiffs must show that: (1) K.O. is an individual with a disability; (2) K.O. is otherwise qualified for benefits under a federally funded program; and (3) K.O. has been denied those benefits because of his disability.  *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). "In the special education context, courts have held that a plaintiff must demonstrate more than an incorrect evaluation or substantively faulty IEP to establish liability; a plaintiff must show that defendants acted with bad faith or gross misjudgment."  *R.B. v. Board of Educ. of the City of New York*, 99 F.Supp. 2d 411, 419 (S.D.N.Y. 2000) (citing *Wenger v. Canastota Cent. Sch. Dist.*, 979 F.Supp. 147, 152 (N.D.N.Y. 1997), *aff'd mem.*, 208 F.3d 204 (2d Cir. 2000)).  "The plaintiff is not

required to show personal animosity or ill will. Rather, intentional discrimination may be inferred

when a school district acts with gross negligence or reckless indifference in depriving a child of

access to a" free appropriate public education. *Gabel v. Board of Educ. of Hyde Park Cent. Sch.*

*Dist.*, 368 F. Supp. 2d 313, 334 (S.D.N.Y. 2005)

Viewing the evidence in the light most favorable to plaintiffs, K.O. was a qualified

individual, and the District failed to offer K.O. a free appropriate public education.  Plaintiffs

argue that the District grossly misjudged K.O.'s educational situation by: dismissing the

possibility that K.O. was emotionally disturbed; pursuing "criminal charges"[15] and a PINS

referral; failing to train Porter regarding the District's "Child Find" obligations under the IDEA[16];

and pursuing criminal charges even after classifying K.O. as emotionally disturbed.  Plaintiffs

further assert that the District grossly misjudged K.O.'s emotional disability and therefore forced

plaintiffs to place K.O. in KidsPeace.  Finally, plaintiffs contend that the District's refusal to pay

for Dr. Hans's evaluation is evidence of its bad faith.

The District has adduced evidence that when K.O.'s difficulties first came to light during

the 2000-2001 school year, it took steps to address K.O.'s difficulties by formulating an

instructional support plan and making a PINS diversion referral.  Further, Porter stated that

referral to the CSE was a final step.  However, viewed in the light most favorable to plaintiffs,

evidence that the District was aware of K.O.'s academic difficulties, that Porter, its social worker,

had recommended that K.O. be evaluated by a mental health professional, and that the District

---

[15]According to a petition filed on August 16, 2001 in Family Court of the State of New York
County of Oneida, on May 7, 2001, at Perry Junior High School, K.O. "knowingly possess[ed]
a pair of scissors and a sign reported to be stolen".  P. Ex. 14.

[16]The IDEA requires school districts to identify, locate, and evaluate disabled children.  20
U.S.C. § 1412 (a)(3)(A).

had implemented a number of disciplinary proceedings against K.O., before considering whether he had a disability impacting his education, together with evidence that the CSE issued two faulty IEPs, may establish that the District acted with bad faith or gross misjudgment.  While this evidence, viewed in the light most favorable to the District may establish, at most, professional misjudgment, the Court concludes that questions of fact precludes summary judgment on this cause of action.  Accordingly, plaintiffs' motion for summary judgment on the Rehabilitation Act claim is denied and defendant's motion for summary judgment dismissing plaintiffs' Rehabilitation Act claim is denied.

**IV.     CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment is **DENIED**; and it is further

**ORDERED** that defendant's motion for summary judgment is **GRANTED** with respect to the IDEA claim, and **DENIED** with respect to the Rehabilitation Act claim.

**IT IS SO ORDERED.**

Date:  March 31, 2009

_____
Norman A. Mordue
Chief United States District Court Judge